FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 OCT -4  PM 3: 24

U.S. DISTRICT COURT
N.D OF ALABAMA

EVA DARLENE MILNER, }
                     }
    Plaintiff,        }
                     }
v.                   }        CASE NO. CV 97-B-2654-S
                     }
TACO BELL CORPORATION, }
                     }
    Defendant.        }

ENTERED

OCT 04 1999

## AMENDED MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment of defendant Taco Bell

Corporation ("Taco Bell" or "defendant").  Plaintiff Eva Darlene Milner ("Milner" or "plaintiff")

brought this suit alleging she was sexually harassed and discriminated against on the basis of her

gender in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

Milner also alleges violations of her rights under the anti-retaliation provisions of Title VII.

Milner further asserts a state law claim of assault and battery.  Upon consideration of the record,

the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the

opinion that defendant's motion is due to be granted.

## I. FACTUAL SUMMARY

Eva Darlene Milner was employed by Taco Bell in its Oneonta, Alabama restaurant from

1993 until her termination on April 3, 1996. (Pl.'s  Evid. Sub. Ex. 1, Milner Aff. ¶ 1.)  Milner

was first employed as a closing crew member. (Pl.'s Evid. Sub. Ex. 9, Milner Dep. at 35.)  She

was then promoted to certified team member (CTM), and within four months was again

promoted to guest service manager, a position she held approximately two years, until her

termination. (Milner Dep. at 37-38.)  Milner's husband, James Milner, was hired at the same

time, also as a closing crew member. (*Id.* at 35.)  However, he terminated his employment with

*37*

Taco Bell in 1995, but was rehired in February of 1996. (Pl.'s Evid. Sub. Ex. 8, James Milner Dep. at 12.) Jeff Payne ("Payne") was the general manager of the restaurant, and Milner's boss, when Milner was hired. (*Id.* at 45.) Faye Elliot ("Elliot") became the general manger after Payne, and she held this position for about a year and a half when Suzette Presley ("Presley") took over the position in February of 1996. (Milner Dep. at 45-47; Pl.'s Evid. Sub. Ex. 11, Elliot Dep. at 9; Pl.'s Evid. Sub. Ex. 12, Presley Dep. at 21-22.) Presley was the general manager of the restaurant for the last four or five months of Milner's employment. (Milner Dep. at 47.) Greg Toomer ("Toomer"), the assistant manager, whom Milner alleges sexually harassed her, worked in the Oneonta restaurant for about the last four months of Milner's employment. (*Id.* at 63-64.)

Milner testified that Toomer's conduct was offensive from the time he began working at the Oneonta restaurant in December of 1995. (*Id.* at 62-63.) Toomer and Milner worked the same shift only about three of the five to seven days per week that Milner worked. (*Id.* at 128.) Milner stated she was able to perform her job despite Toomer's alleged conduct. (*Id.* at 134.) Further, Milner testified that she confronted Toomer about such conduct on three separate occasions. (*Id.* at 114-115, 127.) The first time Milner confronted him was after she and Hogeland, Milner's cousin and co-employee, had discussed Toomer's practice of scheduling all female shifts. (Milner Dep. at 84-85; Pl.'s Evid. Sub. Ex. 7, Hogeland Dep. at 67-69.) The second confrontation occurred after Milner and Angie Lloyd, a fellow employee, discussed Toomer giving another female employee a 75-cent raise before her review was due. This occurred about two or three weeks before Milner was terminated. (Milner Dep. at 92, 95, 116-117.) At that time, Milner expressed her dissatisfaction and told Toomer she wanted to transfer. (*Id.* at 95.) Milner informally discussed the possibility of transferring to the Boaz location with

2

Elliot, who was then a manager at the Boaz restaurant. (*Id.* at 109). On March 26th, Toomer discussed the possible transfer with Presley and told her that Milner wanted to transfer because Milner did not want to work for Presley. (Presley Dep at 67-69.) Presley approved the transfer and told Milner on her next scheduled work day that she could transfer. (*Id.* at 69-70.) However, Milner then said she did not want to transfer. (*Id.* at 70.) After requesting a transfer, Milner again confronted Toomer about his inappropriate conduct. (Milner Dep. at 116-117.)

Milner alleges that Toomer made sexual comments about women virtually every time he was on duty. (Milner Dep. at 65.) Toomer once said he wanted to die by getting caught in bed with a seventeen-year-old by her husband or boyfriend. (*Id.* at 62, 64.) Milner testified that Elliot, the general manager at the time, told Toomer this was an inappropriate comment to make in the workplace. (*Id.* at 86-87.) Toomer would also point out which customers he wanted to engage in sexual relations with and describe exactly what he wanted to do with each. (Milner Dep. at 62, 64; James Milner Dep. at 53; Hogeland Dep. at 107.) Specifically, Toomer stated about one woman, "[I] would like to eat that girl clean from her toes clean up to her pussy." (Milner Dep. at 65.) Referring to a heavy-set woman, he stated, "that needs to be shot." (*Id.* at 62.) However, Toomer never made any sexual comments about Milner to anyone. (*Id.* at 83.)

Milner also testified that Toomer touched many of the female employees, including herself, in an offensive manner. (Milner Dep. at 63, 77, 130.) Specifically, Milner stated that Toomer "was rubbing and patting a lot of the younger female employees on their butts, on their breasts," and that Toomer "had massaged my shoulders and stuff on several occasions that made me feel very, very uncomfortable." (*Id.* at 63.) Milner also stated that Toomer would often pull her hair or massage her shoulders. (*Id.* at 77.) Milner did not feel Toomer was trying to hurt her or assault her by this conduct, it just made her feel very uncomfortable. (Milner Dep. at 78.)

3

Milner related an incident in which three of the female employees had gone swimming and had come to the restaurant sunburned. Milner testified that Toomer "took one of the cooking utensils and put it down Angie Lloyd's back of her pants and was scratching her butt with it." (*Id.* at 114.) Angie Lloyd denies this incident occurred. (Def.'s Evid. Sub. Ex. G, Lloyd Aff. ¶ 7.)

Hogeland approached Milner about his dissatisfaction with Toomer's practice of "touching the girls"and  scheduling all female shifts, thereby reducing Hogeland's hours. (Milner Dep. at 67-69.) Hogeland also heard the comments Toomer made about the female employees and about the female customers. (Hogeland Dep. at 92-93.) He witnessed a female employee sitting in Toomer's lap, and he saw Toomer rubbing Angela Lloyd's buttocks with a spatula. (*Id.* at 63, 66.) Additionally, Hogeland heard Toomer refer to Suzette Presley, who was rumored to be gay, as a "rug smoocher." (*Id.* at 69-70.)

On March 28, 1996, Hogeland anonymously called Taco Bell's 1-800 number for all employee complaints, to report (1) Toomer ordering extra milk and taking it for himself; (2) Toomer touching, rubbing, and flirting with female employees; (3) Toomer's preference for the female employees, resulting in a reduction in Hogeland's hours; (4) Toomer's fight with Presley over Toomer giving a raise to a female employee; and (5) Toomer's bad temper. (Pl.'s Evid. Sub. Ex. 3, Business Abuse Incident Report; Hogeland Dep. at 86-100.) Presley didn't see the complaint at the time it was filed, but she spoke with Don Horner ("Horner"), the market manager, about it. (Presley Dep. at 45.) She and Greg Barnett, the Loss Prevention Manager, investigated the milk incident, and determined that it never occurred. (*Id.* at 45-49.) Presley learned from Horner that she had an "irate employee," and therefore conducted a survey among the employees. (Presley Dep. at 49-51; Horner Dep. at 20.) Presley did not know the complaining employee's charge included alleged incidents of sexual harassment. (Presley Dep.

4

at 50-51.) The surveys did not confirm that sexual harassment was occurring. (Horner Dep. at 20.) Horner never discussed the allegations with either Toomer or Hogeland. (*Id.* at 19, 39-40.)

Milner called in sick on Saturday, March 30, 1996. (Milner Dep. at 139.) She said she had the flu and was going to the hospital. (*Id.*) James Milner received a phone call from Milner at work that day and had to leave work early to pick up the couple's children. (Milner Dep. at 140; Toomer Dep. at 58.) The absence of both James and Darlene Milner left the restaurant shorthanded. (Toomer Dep. at 59.) Toomer discussed the problem with Presley, and she asked him to contact Rose Brown ("Brown") at Human Resources, to find out what to do about the problem of coinciding absences. (Toomer Dep. at 59-60; Presley Dep. at 64.)

Brown informed Toomer that there was a policy against a husband and wife working in the same restaurant when one of them has a supervisory or key-holder position. (Presley Dep. at 64; Toomer Dep. at 59-60.) Brown stated that either one would have to be transferred or both terminated. (Presley Dep. at 62.)

Presley decided to offer Milner the opportunity to transfer to the Boaz restaurant since she had previously requested that transfer. (Presley Dep. at 67.) Milner would remain a guest service manager and receive the same rate of pay, but she would have to work night shifts and travel 52 miles round trip. (Milner Dep. at 154-55; Pl. Complaint ¶ 7.)

On or about April 3, 1996, Toomer and Presley informed Milner of the policy violation. (Milner Dep. at 132, Pl. Complaint ¶ 6.) They told Milner she could either transfer or be terminated. (*Id.*) This was the first Milner had ever heard of such a policy. (*Id.*)

According to Presley, she chose to transfer Milner so that both of the Milners would remain employed, otherwise, she would have to terminate them both. (Presley Dep. at 74.) Milner agreed to the transfer that morning. (Milner Dep. at 135-136.) Milner then returned

5

home, and spoke with her husband about the situation. She also called Horner to voice her objections. (Milner Dep. at 144-45.) Milner further testified that she complained to Horner regarding Toomer's sexual harassment. (Milner Dep. at 145-46.) However, Horner denies she said anything about the alleged harassment. (Horner Dep. at 28.)

Milner then returned to the restaurant and told Presley that her husband would quit so that she would not have to be transferred to the Boaz restaurant.[1] (Milner Dep. at 148.) She told Presley that Horner had informed her that if James Milner was willing to resign, then the problem would be resolved. (*Id.* at 147, 157.) However, Presley informed Milner that the transfer had already been completed and, regardless of whether James Milner continued his employment, Milner could not come back to the Oneonta store because there were too many doctor's excuses in her personnel file. (*Id.* at 149, 157-58.) Milner replied that she did not want to be transferred, and so would accept her termination papers. (Presley Dep. at 78; Milner Dep. at 158.) Milner also told Presley that she felt like "it was Mr. Toomer terminating [her], not [Presley]." (Milner Dep. at 158.) At the time Milner was terminated, Presley was not aware of Milner's complaints regarding Toomer's conduct. (*Id.* at 160; Presley Dep. at 113.)

Management employees of Taco Bell, including Greg Toomer, receive training and instruction in sexual harassment prevention and how to handle such complaints once they are received. (Horner Dep. at 15, 34-35.) Managers of Taco Bell are advised that the company takes a strong stance against all forms of harassment, and the managers are required to sign a form acknowledging such policy. (Horner Dep. p. 35; Def.'s Evid. Sub. Ex. D, Toomer Dep. Ex 3.) Employees also receive information and training regarding Taco Bell's proscription against

---

[1] Presley testified that Milner did not asked to be transferred back to the Oneonta store, only that she wanted her termination papers. (Presley Dep. at 80-82.)

sexual harassment. (Horner Dep. at 36; Def.'s Evid. Sub. Ex. O, Policies & Work Rules from

"The Answer Book.") Further, several different signs are posted throughout the stores, including

the Oneonta store. These posters are explained to the employees during orientation and contain

information regarding complaints about sexual harassment and other business abuse practices.

(Young Dep. at 33; Presley Dep. at 14-15; Toomer Dep. at 30-31.) Horner made sure the posters

were up in all of the stores he managed. (Horner Dep. at 50.)

One poster sets forth employees' rights under various federal laws. (Horner Dep. at 36-

37.) Another poster contains the business cards of the market manager, the human resource

manager, and the vice president, so that employees may contact them to report problems.

(Horner Dep. at 24-25, 37; Young Dep. at 83-85; Def.'s Evid. Sub. Ex. F. Elliot Dep. Ex. 1, 2.)

This poster states, "[e]mployees who have an issue involving sexual harassment may skip any

manager in the dispute resolution process who encouraged or participated in the sexual

harassment." (Def.'s Evid. Sub. Ex. F, Elliot Dep. Ex. 1.)

Additionally, Taco Bell has a 1-800 number, known as "the Network," that employees

can call to report any complaint they have about the store or the management. (Toomer Dep. at

37.) Complaints made to this number come in through a clearinghouse which communicates the

information to the Human Resource Manager, the market manager, the Employee Relations

Coordinator, and the Fair Employment Practices Department. (Young Dep. at 24-25.) The

Human Resource Manager or the Employee Relations Coordinator places a call to the market

manager to discuss the allegations and to determine the appropriate course of action in beginning

an investigation. (*Id.* at 25.) The market manager is in charge of handling the investigation, and

the general manager of the particular restaurant involved usually implements the initial steps of

the investigation, as long as neither is named nor implicated in the complaint. (*Id.* at 27, 29.) If

7

the complaint involves sexual harassment, the market manager advises the Human Resource Manager of the results of the investigation. (*Id.* at 29-30.) There is a poster in every store explaining "the Network," and once every three to six months, the clearinghouse distributes pamphlets with the payroll checks, reminding Taco Bell employees about the 1-800 number. (*Id.* at 33-34.)

While the conduct of which Milner complains was occurring, Milner never called Don Horner to report it, nor did she report it to any restaurant general manager. (Milner Dep. at 76, 86, 91-92.) Further, Milner admits that she saw the "Network" poster containing the 1-800 number for complaints. (Plaintiff's Response to Request for Admission #4.) She further admits that she knew this number was to be utilized for any complaint, including sexual harassment. (Milner Dep. at 121.) Although Milner advised other employees to call the 1-800 number regarding their complaints, she never used it to complain about Toomer's conduct.[2] (*Id.* at 117, 121.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue

---

[2] Milner stated Tara Rhodes told her she was "tired of Mr. Toomer slapping her on the butt," (Milner Dep. at 73), and that she told Rhodes to "call the 1-800 Taco Bell number because [] the 1-800 Taco Bell number was for any complaint . . . [by] the employees." (Milner Dep. at 121.) She also told Hogeland to call the 1-800 number about his complaints. (Milner Dep. at 117, 121.)

8

for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A. Sexual Harassment

Title VII of the Civil Rights Act of 1964, as amended, prohibits employer discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court set forth the analytical framework to be followed in cases involving discrimination based on harassment by a supervisor in the companion cases of *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275 (1998) and *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257 (1998). However, the threshold question is whether discrimination has, indeed, occurred. *See Burlington Industries,* 118 S.Ct. at 2265. Discrimination based on sexual harassment falls into two varieties: quid pro quo sexual harassment and hostile work environment sexual harassment. *Steele v. Offshore Shipbuilding, Inc.,* 867 F. 2d 1311, 1315 (11th Cir. 1989); *Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir. 1982). Quid pro quo sexual harassment

9

"occurs when an employer alters an employee's job conditions as a result of employee's refusal to submit to sexual demands." *Steele,* 867 F.2d at 1315. Hostile environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986); *Steele,* 867 F.2d at 1315.

### 1. Quid pro quo sexual harassment.

Plaintiff, in her EEOC charge and her complaint before this court, claims to have suffered from *quid pro quo* sexual harassment. As noted above, *quid pro quo* sexual harassment "occurs when an employer alters an employee's job conditions as a result of employee's refusal to submit to sexual demands." *Steele*, 867 F.2d at 1315 (citation omitted). An employer is strictly liable for *quid pro quo* sexual harassment because "[w]hen a supervisor **requires sexual favors** as a *quid pro quo* for job benefits, the supervisor by definition, acts as the company." *Id.* at 1316 (emphasis added). "In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the *quid pro quo*." *Henson,* 682 F. 2d at 910; *Steele,* 867 F.2d at 1316.

The gravamen of a *quid pro quo* claim is that a plaintiff is presented with a choice of acceding to sexual demands to gain or avoid losing some job benefit or promotion, or refusing the sexual demands and suffering the consequences. Here, plaintiff simply was not presented with any such bargain. Plaintiff has presented no evidence of sexual blackmail or extortion of "something for something." Neither Toomer nor any other defendant employee ever demanded sexual favors from plaintiff as quid pro quo for jobs benefits. Furthermore, submission to sexual conduct was never a term or condition of plaintiff's employment. In fact, it is undisputed that neither Toomer nor any other employee of Taco Bell ever demanded sexual favors from plaintiff.

10

Additionally, plaintiff admits that Toomer never told her she was going to lose her job because she confronted him, he never asked her not to report her complaints, he never made any threats as to what might happen if she did complain, and Toomer never threatened her job at any time. (Milner Dep. at 125, 130-31.) Thus, plaintiff has no viable *quid pro quo* sexual harassment claim, and defendant is entitled to judgment as a matter of law on this claim.

### 2. **Hostile environment sexual harassment**

An employer may be liable for subjecting an employee to a hostile work environment if an employer's conduct "'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.'" *Vinson*, 477 U.S. at 65 (citation omitted); *Steele*, 867 F.2d at 1315. Hostile work environment sexual harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted); *Cross v. Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995).

The conduct at issue must be severe or pervasive enough to create an "objectively hostile or abusive work environment" to be actionable under Title VII. *Harris*, 510 U.S. at 21. Thus, the "mere utterance" of a remark that engenders offense does not affect the terms, conditions, or privileges of employment to a sufficient degree to violate Title VII. *Henson*, 682 F.2d at 904; *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) ("Incidental, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability. Discourtesy or rudeness, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms

11

and conditions of employment.") (citing *Faragher,* 524 U.S. at ___, 118 S.Ct. at 2283) (internal quotations omitted). In addition, whether an environment is "hostile" or "abusive" must be determined by looking at the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether the conduct unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. at 23; *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521-22 (11th Cir. 1995).

To establish a prima facie case of hostile working environment, a plaintiff must show: (1) that the employee belongs to a protected group; (2) that the employee was subject to unwelcome harassment; (3) that the harassment complained of was based on sex; and (4) that the harassment affected a term, condition, or privilege of the complainant's employment in that it was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive working environment. *Henson,* 682 F.2d at 903-04. Plaintiff has satisfied the first three elements of the prima facie case. Plaintiff is a female who was subject to unwelcome harassment based upon her sex.[3] However, plaintiff's claim of hostile environment sexual harassment fails because, as a matter of law, the harassment was not sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive environment.

Plaintiff provides the following offensive conduct to support her claim of hostile environment sexual harassment: (1) Toomer repeatedly made sexually explicit and derogatory

---

[3] *See Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1246 (11th Cir. 1998) ("When a person 'sexually harasses' another, i.e., makes comments or advances of an erotic or sexual nature, we infer that 'the harasser [is making] advances towards the victim because the victim is a member of the gender the harasser prefers.'" (quoting *Fredette v. BVP Management Assocs.,* 112 F.3d 1503, 1505 (11th Cir. 1997), *cert. denied* ___ U.S. ___, 118 S.Ct. 1184 (1998)).

comments about female customers; (2) Toomer rubbed and patted other female employees on their buttocks and breasts; (3) Toomer massaged plaintiff's shoulders and pulled her hair, which made her feel uncomfortable; and (4) Toomer put a cooking utensil down the back of Angie Lloyd's pants to scratch her buttocks because she was sunburned. While this conduct may have been offensive and inappropriate, it was not sufficiently severe or pervasive to satisfy plaintiff's burden of proof. Plaintiff alleges this conduct occurred repeatedly. However, she and Toomer did not work together on a daily basis. Additionally, plaintiff stated she was able to perform her job despite Toomer's conduct.

In *Morrow v. Auburn Univ. at Montgomery*, 973 F. Supp. 1392 (M.D. Ala. 1997), a plaintiff alleged conduct much more severe and pervasive than the harassment alleged in this case and still failed to persuade the court that the conduct was actionable sexual harassment. In *Morrow*, the plaintiff alleged that her supervisor repeatedly engaged in harassing conduct towards her, including inappropriate contact and comments over a period of five years. *Id.* at 1403-04. The plaintiff complained to the Dean about this conduct by her supervisor, but the

13

supervisor did not cease the inappropriate conduct.[4]  *Id.* at 1398, 1404.  The court held that while "such conduct is unprofessional and disrespectful," it "was not sufficiently severe and pervasive to be actionable under Title VII."  *Id.* at 1404.

The conduct which is the primary subject of the plaintiff's complaint is the harassment perpetrated by Toomer.  When viewed separately or collectively, plaintiff's allegations do not rise to the level of being so severe and pervasive as to alter the conditions of her employment and create an abusive atmosphere.  Viewing all the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor, this court finds that plaintiff has failed to establish a prima facie case of hostile environment sexual harassment.  Thus, defendant's motion for summary judgment on this claim is due to be granted.

Even assuming arguendo that plaintiff had established a prima facie case, defendant would still be entitled to judgment as a matter of law via the affirmative defense set out by the Supreme Court in *Burlington Industries* and *Faragher*.  The Court's decisions in these two cases

----

[4]  In *Morrow*, the specific allegations of the plaintiff were as follows:

> [P]laintiff alleges that her work environment was hostile because of Denton's demeaning and condescending references and conduct toward her. Specifically, plaintiff complains that . . . Denton patted her on her rear with a ruler "in public;". . . Denton put his arm around her shoulder and rubbed the back of her neck in front of the students in the lab; . . . Denton intentionally stood close behind her in "a rude fashion" when she was standing in front of a supply closet; . . . Denton attempted, teasingly, to soil her shoes in front of her colleagues; Denton referred to her in diminutive terms such as "teeny bopper" "little scientist" and "warm lady" in front of her colleagues and students and often made comments about her figure including . . . how she lost weight and regained her figure after a pregnancy; and counseled plaintiff to "work her charms" and be "everybody's little darling" to get support for tenure among her colleagues. According to plaintiff, after November 1993, Denton purposely tried to embarrass her and make her feel uncomfortable.

*Morrow*, 973 F. Supp. at 1403-04.

14

provide that a supervisor's actions "must be imputed to the employer when those actions are (1) discriminatory; and (2) aided by the agency relationship." *Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1367 (11th Cir. 1999). Further, "employers are vicariously liable for the actions of their supervisory personnel when the supervisor creates a hostile environment in the workplace. It is not necessary that those at the highest executive levels receive actual notice before an employer is subject to liability for sexual harassment." *Id.*

In establishing liability, the Supreme Court distinguished harassment culminating in a "tangible employment action" and harassment involving the "intangible harm of the indignity and humiliation caused by hostile work environment sexual harassment." *Id.* Where there is an adverse tangible employment action taken by the supervisor coupled with evidence of sexual harassment, the employer is vicariously liable. *Id.* (citing *Faragher,* 524 U.S. at ___, 118 S.Ct. at 2292-93; *Burlington Industries,* 524 U.S. at ___, 118 S.Ct. at 2270). However, where only intangible employment action by the supervisor is involved, an employer may assert an affirmative defense to preclude liability. To succeed on this defense, the employer must show, "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (citations omitted).

Plaintiff asserts that adverse tangible employment action was taken against her in that she was terminated for complaining about Toomer's sexually harassing conduct. The evidence shows plaintiff confronted Toomer on three occasions about his inappropriate behavior. (Milner Dep. at 84-85, 92, 95, 114-17, 127). Plaintiff also stated that she informed Don Horner of the alleged sexual harassment, however, this was not until *after* she had been given the option to

15

transfer or be terminated by Presley. (Milner Dep. at 145-46.) Presley was responsible for the employment decision, and, at the time she made the decision, she was unaware of any complaints of sexual harassment by plaintiff. (Milner Dep. at 160-61; Presley Dep. at 113.) This is not a situation in which the harasser is responsible for the adverse employment decision. *See Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1248 (11th Cir. 1998) (employee claiming sexual harassment can't benefit from the inference of causation arising from the common identity of a harasser and a decision maker where the alleged harasser did not make the decision to terminate plaintiff's employment). In the case at bar, the harassment did not *culminate*, nor is it connected to, the employment action. *See Robinson v. Truman College,* 1999 WL 33887 *6 (N.D. Ill.) (court found no tangible employment action where alleged harasser's conduct did not "culminate" in plaintiff's dismissal); *Lara v. City of New York,* 1999 WL 459803 *6 (S.D.N.Y.) (affirmative defense was available where plaintiff had not offered evidence to raise an issue of fact about the City's explanation for its decision to place plaintiff on leave of absence, and thus had not shown that defendant's conduct "culminated" in a tangible employment action); *Fierro v. Saks Fifth Avenue,* 13 F.Supp.2d 481, (S.D.N.Y. 1998) (alleged harasser had nothing whatsoever to do with plaintiff's discharge, and therefore, the alleged harassment did not "culminate" in plaintiff's discharge). Thus, defendant is entitled to assert the affirmative defense as articulated in *Faragher* and *Burlington Industries.*

"A court's assessment as to whether a defendant has proved this defense requires, first, an analysis of whether the employer has exercised reasonable care in preventing sexual harassing behavior." *Coates,* 164 F.3d at 1369. Here, defendant has in place formal, yet easily accessible, anti-harassment policies and procedures: (1) there are posters throughout the stores informing employees of several phone numbers they can call to report harassment (Presley Dep. at 14-15;

Young Dep. at 33; Toomer Dep. at 30-31); (2) employees are instructed that they may skip anyone in the dispute resolution process who encouraged or participated in the sexual harassment (Horner Dep. at 25; Def.'s Ev. Sub. Ex. F, Elliot Dep. Ex. 1); (3) there is a Business Abuse Hotline number on which such complaints can be made (Toomer Dep. at 37; Young Dep. at 33-34); and (4) management employees of Taco Bell are given instruction and training in preventing sexual harassment and in handling complaints involving sexual harassment (Horner Dep. at 15, 34, 35). Thus, the court finds that defendant exercised reasonable care and had ample measures in place for preventing sexual harassment.

The second step in this analysis is to determine whether the employee "made reasonably sufficient use of available avenues to put the employer on notice of the problem." *Coates,* 164 F.3d at 1369. The court finds that plaintiff failed to avail herself of any of the anti-harassment procedures established by Taco Bell. Plaintiff testified she had seen the posters and knew the 1-800 business abuse number was to be used for any complaints of employees, including sexual harassment. In fact, she testified she had advised two co-employees to utilize the number for such complaints. Plaintiff's only action was in complaining to Toomer, the alleged harasser, and in complaining to Don Horner on the day she was terminated. Thus, plaintiff failed to utilize the avenues created under defendant's anti-harassment policy, and she failed to put defendant on notice of the alleged harassment.

However, even if defendant was found to have had adequate notice of the ongoing harassment, defendant could succeed on the defense under the third prong of the analysis in that defendant reasonably responded to plaintiff's complaint. *Coates,* 164 F.3d at 1369. Presley, under the direction of Horner, conducted an investigation within a reasonable time after learning of plaintiff's allegations, and found no evidence that sexual harassment was or had been taking

17

place. Hogeland called the 1-800 complaint number on March 28, 1996, and alleged that

Toomer had ordered extra cases of milk for his personal use and had engaged in sexually

inappropriate behavior with the female employees. (Pl. Ex. 3.) Plaintiff complained to Don

Horner about Toomer's sexually harassing conduct on April 3, 1996, the day she was terminated.

(Milner Dep. at 145.) Plaintiff filed her EEO complaint alleging sexual harassment on April 8,

1996. (Pl. Ex. 2.) Horner spoke with Presley regarding the allegations, and she informed Horner

that she had never seen any of the conduct described in the allegations. (Horner Dep. at 48.)

Presley initiated confidential employee surveys, most of which were dated April 11, 1996, or

April 14, 1996.[5] (Horner Dep. at 52.) Horner testified that nothing was revealed on any of the

confidential employee surveys to indicate that sexual harassment was or had been taking place,

so there was no reason to take counseling or coaching measures against Toomer. (Horner Dep. at

47.)   The court finds that defendant took reasonable care to prevent and promptly correct the

harassing behavior. Therefore, defendant has satisfied its burden in proving the affirmative

defense and is entitled to judgment as a matter of law as to plaintiff's claims of sexual

harassment.

## B. Retaliation

Plaintiff also alleges she was subjected to illegal retaliation for protesting the alleged

sexual harassment at issue. Under Title VII, employees are protected from retaliation for

---

[5] Once Horner was notified of a complaint, he would initiate the investigatory process. If an emergency situation was not involved, he would call the general manager and have them get in contact with human resources, get a copy of the survey form, and get the form reproduced. As the employees would come in on the particular day and shift they were assigned to work, they were asked to fill out the form and send it back. (Horner Dep. at 52.) Hogeland stated that Toomer passed out the survey and stayed in the room with the employees as they filled it out. (Hogeland Dep. at 101, 104-106.) Presley stated that she, not Toomer, handed out the surveys. She further testified that she told everyone to answer honestly, no one was in trouble, and they didn't have to give their names. (Presley Dep. at 52-54.)

opposition to unlawful employment practices or for making a charge, testifying, or participating in any investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000-3(a).

In analyzing plaintiff's claim, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant succeeds in carrying this burden, then any "presumption of discrimination created by the *McDonnell Douglas* framework drops from the case, and the factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination or retaliation). *Burdine*, 450 U.S. at 253. A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs*, 106 F.3d at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

In order to establish a prima facie case of retaliation, plaintiff must demonstrate, (1) that she engaged in a statutorily protected activity; (2) that the employer took some adverse

employment action against her; and (3) that a causal connection exists between the two. *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992) (citations omitted); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). The fact that the adverse employment action was taken after the protected activity, is generally insufficient by itself to prove a causal connection to satisfy a prima facie case. *See Booth v. Birmingham News Co.*, 704 F. Supp. 213, 215-17 (N.D. Ala.), *aff'd*, 864 F.2d 793 (11th Cir. 1988); *cf. Hamm v. Members of Board of Regents*, 708 F.2d 647, 652-54 (11th Cir. 1983) (holding that plaintiff failed to establish a causal link between her transfer and her activity even though she was transferred shortly after filing a written complaint with the EEOC).

Plaintiff claims that she was retaliated against for complaining to Toomer regarding his conduct, and for complaining about Toomer's conduct to Don Horner, the market manager. Because making a complaint of sexual harassment to an employer constitutes protected conduct, plaintiff satisfies the first prong of the prima facie test. Plaintiff has also demonstrated that she suffered an adverse employment action, in that she was terminated. However, plaintiff has failed to show a causal connection between the adverse action and the protected conduct. Presley, the individual responsible for making the adverse employment decision, based her decision on the advice of the human resources department. More importantly, she was not aware of the alleged sexual harassment taking place, nor was she aware that plaintiff had complained to Toomer about his conduct. The fact that Toomer was with Presley when she informed plaintiff of the alternative to transfer or be terminated does not aid the plaintiff's argument because Toomer was not responsible for making the decision. Further, plaintiff's allegation that she was retaliated against for informing Don Horner of Toomer's conduct is illogical, because she did not inform him of the harassment until *after* learning she had to transfer or else be terminated. The record is

20

simply devoid of any evidence that anyone responsible for making the adverse employment decision had any knowledge of plaintiff's complaints regarding Toomer's conduct. Because plaintiff has not put forth evidence on which a reasonable jury could find a causal connection between the adverse employment action and the protected conduct, she has not established a prima facie case of retaliation. Therefore, defendant's motion for summary judgment as to plaintiff's retaliation claim is due to be granted.

## C. Disparate Treatment

In any action alleging disparate treatment by an employer, the plaintiff must prove the employer acted with a discriminatory motive. *International Board of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To establish a prima facie case of discrimination, a plaintiff may employ direct, statistical, or circumstantial evidence. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989). The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon whether the plaintiff's proof is direct or circumstantial in nature.

### a. Direct Evidence

The parties agree there is no direct evidence to support plaintiff's claim of disparate treatment gender discrimination. Thus, plaintiff must rely on circumstantial evidence to support her claim.

### b. Circumstantial Evidence

Because plaintiff is relying on circumstantial evidence to support her Title VII claim, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit

jurisprudence). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant succeeds in carrying this burden, then any "presumption of discrimination created by the *McDonnel Douglas* framework drops from the case, and the factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination or retaliation). *Burdine*, 450 U.S. at 253. A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs*, 106 F.3d at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

The plaintiff must first establish a prima facie case by proving that (1) she is a member of a protected class; (2) she was qualified for the job she held; (3) despite her qualifications, she was terminated; and (4) her former position remained open after her termination and the employer continued to seek similarly qualified applicants. *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 964 (11th Cir. 1997).[6] Viewing the evidence in the light most favorable to the plaintiff, Milner has established a prima facie case of discrimination in that she is a member of a

---

[6] *See McDonnell Douglas*, 411 U.S. at 802 n. 13 ("The facts necessarily will vary in Title VII cases, and the specification [] of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.")

protected class, she was qualified for the position which she held, and she was terminated while

her husband was allowed to remain at the Oneonta restaurant.  Defendant asserts that neither

plaintiff nor her husband were qualified for the positions they held because of the company

policy prohibiting spouses from working in the same store where one spouse was a supervisor.

However, in making this argument, defendant has not addressed the provision of the policy that

states:

> [i]f a marriage of employees results in a conflict with this policy, the Company
> will consider an offer of transfers which would resolve the conflict.  However, if
> one of the offers is not accepted within a reasonable period of time, *either one* of
> the employees must resign or the Company will terminate the *employee hired*
> *most recently*.

(emphasis added.) (Pl.'s Evid. Sub. Ex. 4, "Employment of Relatives" Policy.)  Thus, plaintiff

was qualified for the position which she held since only one spouse had to transfer or be

terminated.  Only plaintiff was told she must either terminate or transfer.  Plaintiff has presented

a prima facie case, which creates a rebuttable presumption of discrimination.

Defendant's burden to rebut the presumption created in such a situation is one of

production rather than proof, requiring defendant to articulate a legitimate, nondiscriminatory

reason for its action. *Burdine*, 450 U.S. at 257-58.  In satisfying this burden:

> > [t]he employer's burden of rebuttal is "exceedingly light."  Since
> > the rebuttal burden is one of production only, the employer "need
> > not persuade the court that it was actually motivated by the
> > proffered reasons . . . .  It is sufficient if the [employer's] evidence
> > raises a genuine issue of fact as to whether it discriminated against
> > the [employee]."

*Tipton*, 872 F.2d at 1495 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248,

254-55 (1981)) (alterations in original).

Defendant asserts that Presley offered the transfer only to plaintiff because plaintiff had

requested the previous week to be transferred to the Boaz restaurant. (Presley Dep. at 67.)

23

Presley stated that if plaintiff had refused the transfer, she would have terminated both James and

Darlene Milner. (Presley Dep. at 74.)  Plaintiff initially accepted the transfer. (*Id.* at 76.)

However, according to Presley, when plaintiff came back to decline the transfer, Presley had

already formally transferred her to the Boaz restaurant and plaintiff never asked to be transferred

back to Oneonta.  (*Id.* at 77-82.)  Presley also told plaintiff she could not come back to the

Oneonta store because she had too many medical excuses in her personnel file.  (Milner Dep. at

149.)  Taco Bell's burden is one of mere production and involves no credibility assessment. *See*

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993).  Thus, defendant has met its burden.

"[T]he presumption of discrimination created by the *McDonnel Douglas* framework drops from

the case and the factual inquiry proceeds to a new level of specificity." *Combs v. Plantation*

*Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997) (citation and quotation omitted).

　　　"Because the plaintiff bears the burden of establishing pretext, [s]he must present

'significantly probative' evidence on the issue to avoid summary judgment." *Carter,* 870 F.2d at

585 (quoting *Young v. General Foods Corp.,* 840 F.2d 825, 829 (11th Cir. 1988) (internal

quotation omitted).  In establishing pretext, the plaintiff must demonstrate that the proffered

reason was not the real reason for the adverse employment decision. *Combs,* 106 F.3d at 1528.

Further,

> [t]he plaintiff may succeed by directly persuading the court at trial that a
> discriminatory reason more likely motivated the employer or indirectly by
> showing that the employer's proffered explanation is unworthy of credence.  In
> order to establish pretext, the plaintiff is not required to introduce evidence
> beyond that already offered to establish the prima facie case. . . . [O]nce a plaintiff
> has established a prima facie case and has put on sufficient evidence to allow a
> fact finder to disbelieve an employer's proffered explanation for its actions, that
> alone is enough to preclude entry of judgment as a matter of law.

*Id.* at 1530, 1532 (citations omitted).

Plaintiff points to the discriminatory manner in which the policy was applied as evidence of pretext. The policy provides that if neither spouse is willing to transfer, the spouse with the least seniority will be terminated. (Pl.'s Evid. Sub. Ex. 4, "Employment of Relatives" Policy.) However, only plaintiff was told she must transfer or be terminated. Milner testified that Horner stated that if James Milner resigned, the problem would be solved. (Milner Dep. at 147, 157.) On April 3, 1996, when plaintiff returned to Taco Bell to inform Presley that she did not want to transfer and her husband was going to quit so that she could keep her job in Oneonta, Presley refused to consider this resolution of the problem. (Milner Dep. at 148-49, 157-58.) Plaintiff argues that since James Milner had less seniority than the plaintiff, according to the policy, he should have been the one terminated. Although plaintiff points out that Taco Bell's policy was apparently applied incorrectly, this is not "significantly probative" evidence on which a reasonable jury could conclude that defendant's proffered explanation for its action[7] was pretext for illegal discrimination based on the plaintiff's gender. Therefore, defendant's Motion for Summary Judgment as to this claim is due to be granted.

## D. Assault and Battery

In her complaint, plaintiff alleges that Toomer's actions constituted assault and battery, and that defendant "authorized, ratified and/or condoned" this conduct. (Pl.'s Compl. ¶ 22). An

---

[7] Again defendant's articulated reason was as follows:
> Company policy prohibited spouses from working in the same store when one spouse was a key holder. Therefore, either plaintiff or her spouse had to be transferred or terminated. Suzette Presley offered the transfer to plaintiff because plaintiff had requested such a transfer the previous week. When plaintiff decided she did not want to transfer, Presley states that the transfer was already completed and told plaintiff she could not come back to the Oneonta store because she had too many medical excuses in her personnel file.

assault is an "intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt if not prevented." *Holcombe v. Whitaker*, 294 Ala. 430, 435, 318 So.2d 289, 294 (1975). Further, to prevail on a claim alleging battery, a plaintiff must demonstrate: "that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex Parte Atmore Community Hospital,* 719 So.2d 1190, 1193 (Ala. 1998) (citation omitted).

In *Ex Parte Atmore Community Hospital,* the court held that the plaintiff had produced substantial evidence that the defendant committed a battery where the evidence indicated defendant had "touched [plaintiff's] waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg." *Id.* at 1194. The evidence further indicated that "each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." *Id.* In the case at bar, plaintiff has presented evidence that Toomer massaged her shoulders and pulled her hair, that Toomer intended such contact, and that these touchings made her feel "very, very uncomfortable." (Milner Dep. at 63, 77.) Thus, plaintiff has established a prima facie case of battery.

In order for defendant to be held liable for the intentional torts of its agent, Toomer, plaintiff must offer evidence that "(1) the employee's acts [were] committed in furtherance of the business of the employer; (2) the employee's acts [were] within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the tortious acts." *Ex parte Atmore Community Hospital,* 719 So.2d at 1194, citing *Potts v. BE & K Constr. Co.,* 604 So.2d 398, 400 (Ala. 1992).

Toomer's actions were not in furtherance of defendant's business. The Alabama Supreme Court has held that "where a co-employee defendant's behavior is aimed at satisfying the co-employee's own lustful desires . . . no corporate purpose could conceivably be served." *Id.*, citing *Busby v. Truswal Systems Corp.*, 551 So.2d 322, 327 (Ala. 1989) (internal quotation omitted). Because the evidence indicates that Toomer's alleged conduct was intended solely to gratify his own "lustful desires," defendant cannot be liable for a battery by Toomer on the grounds that his conduct furthered the interest of the restaurant's business.

Furthermore, Toomer was not acting within the scope of his employment when he committed the alleged battery. Tortious acts committed by an employee may be deemed within the scope of his employment "if the acts are so closely connected with what the servant is employed to do and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *Atmore Community Hospital,* 719 So.2d at 1194, citing Prosser & Keeton, The Law of Torts 503 (5th ed. 1984) (internal quotation omitted); *see also Hendley v. Springhill Memorial Hospital,* 575 So.2d 547, 548-49 (Ala. 1990) (holding that an employee's unauthorized sexual touching, by its very nature, was not an act incidental to the employment relationship, nor was it in promotion of the employee's duties). Here, the evidence of Toomer's alleged battery indicates that his conduct was completely personal in nature and not within the prescribed duties of his employment. Thus, defendant cannot be held liable for Toomer's alleged conduct on the ground that his conduct was within the line and scope of his employment.

Finally, an employer may be liable for an employee's intentional torts if the employer ratifies such conduct. An employer may ratify an employee's wrongful conduct if the employer "(1) had actual knowledge of the tortious conduct of the offending employee and that the tortious

27

conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation." *Potts v. BE & K Constr. Co.,* 604 So.2d 398, 400 (Ala. 1992); *see also Scott v. Estes,* 1999 WL 606884, *11. Hogeland called the 1-800 complaint number on March 28, 1996, and alleged that Toomer had ordered extra cases of milk for his personal use and had engaged in sexually inappropriate behavior with the female employees. (Pl. Ex. 3.) Plaintiff complained to Don Horner about Toomer's sexually harassing conduct on April 3, 1996, the day she was terminated. (Milner Dep. at 145.) Plaintiff filed her EEO complaint alleging sexual harassment on April 8, 1996. (Pl. Ex. 2.) Horner spoke with Presley regarding the allegations, and she informed Horner that she had never seen any of the conduct described in the allegations. Presley initiated confidential employee surveys, most of which were dated April 11, 1996, or April 14, 1996. (Horner Dep. at 52.) Horner testified that nothing was revealed on any of the confidential employee surveys to indicate that sexual harassment was or had been taking place, so there was no reason to counsel or discipline Toomer. (Horner Dep. at 47.)

Although defendant had knowledge of the alleged tortious conduct, the court finds it took adequate steps to remedy the situation. In order for the employer's remedial actions to be deemed "adequate," the employer must take reasonable and necessary steps to stop the tortious conduct. *Ex parte Atmore Community Hospital,* 719 So.2d at 1195, citing *Potts,* 604 So.2d at 401. In the case at bar, the employer investigated the allegations within a reasonable time and found there was no evidence to warrant punishment of the alleged harasser. Plaintiff's employment with the restaurant ended within the same time frame in which the complaints and investigation were transpiring. Therefore, the alleged conduct could not continue. Further,

plaintiff has produced no evidence of any type of improper conduct occurring after defendant's investigation. *See Potts v. BE & K Constr. Co.,* 604 So.2d 398, 401 (Ala. 1992) (stating that if the employer, as soon as it was practical to do so after learning of the conduct, takes steps to stop the tortious conduct and the tortious conduct stops, the steps taken by the employer are adequate). Defendant took adequate steps "reasonably calculated to halt the harassment," and is therefore not liable for battery on the ground that defendant ratified Toomer's conduct. *See id.* at 401. There is no evidence indicating that Toomer's conduct was in furtherance of defendant's business, that Toomer was acting within the scope of his employment when he engaged in such conduct, or that defendant ratified Toomer's conduct. Thus, defendant's motion for summary judgment as to the assault and battery claim is due to be granted.

### IV. CONCLUSION

Upon consideration of all the evidence in the case, the court concludes that there is no genuine issue of material fact as to plaintiff's claims of *quid pro quo* and hostile environment sexual harassment, disparate treatment, retaliation, and assault and battery. Thus, defendant's Motion for Summary Judgment as to these claims is due to be granted.

**DONE** this 4th day of October, 1999.

SHARON LOVELACE BLACKBURN
United States District Judge

29